**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

**JAVARIUS DEVILLE TAYLOR**                                                    **PLAINTIFF**

**v.**                                                    **Civil Action No. 3:25-cv-124-RPC-RP**

**CITY OF BATESVILLE, MISSISSIPPI,**
**et al.**                                                    **DEFENDANTS**

**MEMORANDUM OPINION**

Plaintiff Javarius Taylor ("Taylor") brings this civil rights action pursuant to 42 U.S.C. § 1983 against the City of Batesville, Mississippi ("the City"), the Batesville Police Department, the Panola County Sheriff's Department[1], Officer Matthew Brown, Officer Titus Benson, Sergeant Greg Jones, Lieutenant Josh Busby, and Lieutenant Will Parish. Plaintiff alleges that officers with the Batesville Police Department ("BPD") used excessive force in violation of his Fourth Amendment rights when effectuating his arrest on October 12, 2024, during a dispute outside of a gas station in Batesville, Mississippi. Plaintiff also brings claims for civil assault and battery, failure to train and supervise, unlawful arrest, equal protection, negligent infliction of emotional distress, delay or denial of medical care, and a *Monell*[2] claim against the City.

Before the Court is a Motion for Summary Judgment [Doc. 56] brought by Matthew Brown, Titus Benson, Josh Busby, Greg Jones, Will Parrish ("the individual Defendants"), the City, and the BPD. These Defendants argue that Plaintiff's excessive force claim, civil assault and battery claim, unlawful arrest claim, and equal protection claim are barred by *Heck*.[3] The City

---

[1] The Court granted Panola County Sheriff's Department's Motion for Judgment on the Pleadings [Doc. 13] and dismissed it from this lawsuit on December 19, 2025. *See* [Doc. 45].

[2] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

[3] *Heck v. Humprey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994).

1

argues that Plaintiff fails to support his *Monell* claim under theories of failure to train or supervise, equal protection, or delay or denial of medical care. BPD argues it is not a separate legal entity capable of being sued. Lastly, the individual Defendants assert that they are shielded from liability under the doctrine of qualified immunity.

The Defendants filed their Motion for Summary Judgment on April 3, 2026. [Doc. 56]. Plaintiff responded on April 22, 2026, [Doc. 61], and Defendants filed their reply on May 1, 2026. [Doc. 65]. On May 28, 2026, the Court entered an Order requesting the parties file supplemental briefs further addressing qualified immunity on the excessive force claim. [Doc. 68]. In accordance with the Court's Order, the Defendants field their supplemental brief on June 19, 2026, [Doc. 71], Plaintiff responded on July 3, 2026, [Doc. 72], and Defendants replied to the response on July 6, 2026. [Doc. 73]. Having reviewed the parties' respective filings, and for the reasons contained herein, Defendants' [56] Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

### *FACTS*

Plaintiff was arrested at a gas station in Batesville, Mississippi, on October 12, 2024. [Doc. 1 at 22-23].[4] Law enforcement officers with the BPD and the Panola County Sheriff's Department were called to the scene to disperse a large crowd of individuals who were loitering in two neighboring gas station parking lots. Attached to Defendants' Motion is the body camera footage of Officer Jones and Officer Brown. [Doc. 56, Ex. A; Ex. B]. Officer Jones's body camera footage shows him and other officers directing individuals from the gas station to leave the premises. [Doc.

---

[4] The Court's opinion focuses solely on the events surrounding Plaintiff's arrest. The Complaint also paints a broad picture of harassment at the hands of the BPD, including an interaction in "the Spring of 2012," a "pretextual traffic stop" without a referenced date, two other pretextual traffic stops at some point in 2022, an interaction at Dodge's Gas Station sometime in 2023, and an "unlawful" traffic stop on October 11, 2024. [Doc. 1 at 15-20]. Because Plaintiff has waived every claim except for his excessive force claim, the Court does not address these previous alleged instances of harassment.

56, Ex. A]. While doing so, the officers noticed vehicles that were left unattended at gas pumps, including a black and green Corvette. *Id* at 13:35. The officers discussed calling tow trucks to come and tow the vehicles. *Id.* at 13:57. A few minutes later, two individuals walked from the neighboring gas station parking lot and got into the Corvette. *Id.* at 17:20. Defendant Parish, presumably pointing to Plaintiff, told the two individuals "that man saved you. He lied and he told me that was his car." *Id.* at 17:25. Defendant Parish then looked in Plaintiff's direction, called him a liar, and warned him that if he lied again, he would be taken to jail. *Id.* at 17:30. Parish then instructed Plaintiff to leave the premises. *Id.* at 17:39.

Plaintiff then walked towards the two individuals who entered the Corvette and told them that one of the officers—presumably Defendant Parish—did not like him. *Id.* at 17:45. At this point, Defendant Jones instructed Plaintiff to "walk on, or you're going to jail." *Id.* at 17:52. Plaintiff began to comply with this instruction and started walking away from the officers. *Id.* at 18:04. However, Plaintiff quickly turned around after Officer Jones said to him that he was "acting like [he was] retarded." *Id.* at 18:07. When Plaintiff turned back around and started walking back towards him, Officer Jones pulled out his handcuffs and told him to turn around and place his hands behind his back. *Id.* at 18:09. When Officer Jones grabbed Plaintiff and attempted to place him in handcuffs, Plaintiff pulled away and said "don't grab me." *Id.* at 8:11.

The body camera footage becomes somewhat confusing at this point, but what is clear is that there was a tense and rapidly evolving situation between Plaintiff and law enforcement officers. Officer Jones and Plaintiff became involved in a verbal and physical confrontation, with Plaintiff pleading he had done nothing wrong and officers repeatedly instructing him to submit to being handcuffed. *Id.* at 18:20. Other officers then came to assist Officer Jones's in handcuffing Plaintiff. *Id.* at 18:30. While Officer Jones had a hold of on one of Plaintiff's arms, other officers

3

instructed Plaintiff to get on the ground. *Id*. When Plaintiff refused to get on the ground, one of the officers deployed their taser, which was largely ineffective. *Id.* at 18:35.

A physical confrontation then ensued between Plaintiff and multiple officers. Three of the officers tackled Plaintiff and jumped on top of him while he was lying face up. *Id.* at 18:45-18:54. Officer Jones then placed his hands on Plaintiff's face and neck area, pushing Plaintiff's cheek and the side of his head onto the pavement. *Id.* at 18:56. Officer Jones then delivered two or three strikes to Plaintiff's head and neck area while instructing him to "quit fighting." *Id.* at 19:00. One of the officers then deployed another taser or "drive-stun" while Officer Jones was still pressing Plaintiff's face to the pavement with both hands. *Id.* at 19:05. The officers continually instructed Plaintiff to roll over throughout the struggle. *Id.* at 19:10. Plaintiff was tased again. *Id.* at 19:15. In response to the officers' commands to roll over, Plaintiff said "I'm trying to!" *Id.* at 19:20. Once Officer Jones stopped pressing Plaintiff's head and face area into the ground, he then flipped over onto his stomach. *Id.* at 19:21. Officers then placed him in handcuffs, simultaneously disengaged, and walked away from the Plaintiff lying face down on the ground. *Id.* at 19:30.

Officer Brown's body camera footage paints a similar picture. *See* [Doc. 56, Ex. B]. He was initially not in the vicinity when the initial struggle with Plaintiff ensued but quickly ran over from the neighboring gas station parking lot when he realized what was happening. Officer Brown was one of the officers who jumped on top of Plaintiff after he was tackled and one of the officers who deployed a drive-stun taser application while Plaintiff was on the ground. *Id.* at 01:30. Once Plaintiff is handcuffed, Officer Brown initially walked away towards the front of the parked patrol cruisers. *Id.* at 01:50. He then returned to Plaintiff and instructed him to give him his wallet, which was clinched tightly in Plaintiff's hand. *Id.* at 02:18. Brown attempted to pry the wallet from his hand to no avail. *Id.* 2:20. When this brief attempt to retrieve the wallet failed, Brown delivered a

4

five second stun-drive application to Plaintiff's back. *Id.* at 02:30. Plaintiff then released his grip on the wallet, *Id.* at 12:32, and Brown yells, "when I ask you to do something you do it!" *Id.* at 02:35.

Based on this sequence of events, Plaintiff brings nine claims for relief: excessive force pursuant to 42 U.S.C. § 1983 against Defendants Busby, Brown, Jones, Benson, and Parish (Claim I); civil assault and battery against Defendants Brown, Busby, Benson, Jones, Parish, and the City (Claim II); a ***Monell*** claim under theories of failure to train and supervise pursuant to § 1983 against the BPD and the City (Claim III); unlawful arrest pursuant to § 1983 against Defendants Parrish, Jones, Benson, and Brown (Claim IV); a Fourteenth Amendment Equal Protection claim against all Defendants (Claim V); a ***Monell*** claim against Panola County (Claim VI) (which has since been dismissed); a negligent infliction of emotional distress claim against all Defendants (Claim VII); a bystanders liability claim and the all officer Defendants (claim VIII); and a delay/denial of medical care, presumably against all the Defendants as none are specifically listed (Claim IX).

### STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view all evidence in the light most favorable to the non-movant. ***Maker v. Coborn***, 170 F.4th 988, 992 (5th Cir. 2026). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issues of material fact." ***Celotex Corp. v. Catrett***, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). But once the movant meets this burden, the nonmoving party must "go

5

beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324.

Qualified immunity alters the usual burden of proof for summary judgment motions. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). Once an official raises the defense of qualified immunity, the burden shifts to the Plaintiff to overcome it. *Id.* A plaintiff can overcome qualified immunity by establishing a genuine fact issue as to whether the official violated a statutory or constitutional right that was clearly established at the time of the conduct. *Bailey v. Ramos*, 125 F.4th 667, 674 (5th Cir. 2025).

Furthermore, where video evidence exists, the Court must "view the facts in the light depicted by the videotape." *Boyd v. McNamara*, 74 F.4th 662, 665 (5th Cir. 2023) (quoting *Salazar v. Molina*, 37 F.4th 278, 280 (5th Cir. 2022)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the [video], so that no reasonable jury could believe it," a court should not adopt the non-movant's version of the facts when ruling on a motion for summary judgment. *Bailey*, 125 F.4th at 675 (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)); *see also Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018) (noting that, at the summary judgment stage, "a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe [the nonmovant's] account."). Instead, the Court "assign[s] greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Id.* at 675 (citation omitted).

*Discussion*

## I.    Abandoned Claims

6

A party seeking summary judgment—the movant and/or Defendant—bears the initial burden of identifying those portions of the record which it believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322-23. Once the movant carries its burden, the burden shifts to the non-movant and/or Plaintiff to show that summary judgment should not be granted. *Id.* at 324-25. Thus, it is Plaintiff's burden to overcome the Defendants' arguments and evidence on each of his claims for those claims to survive past summary judgment. *See* Fed. R. Civ. P. 56(e) ("[W]hen a motion for summary judgment is made and supported…an adverse party may not rest upon…mere allegations or denials…[but] must set forth specific facts showing that there is a genuine issue for trial.").

Because Plaintiff's [62] response brief only addresses the excessive force claim against the individual Defendants, he has failed to satisfy his burden of demonstrating a genuine dispute of material fact as to his remaining claims. Accordingly, those claims are deemed abandoned. *See Soadjede v. Ashcroft*, 324 F.3d 830, 833 (5th Cir. 2003) (holding that failure to brief substantive issues constitutes abandonment of claims); *Terry Black's Barbecue, LLC v. State Automobile Mut. Ins. Co.*, 22 F.4th 450, 459 (5th Cir. 2022) ("A plaintiff abandons claims when it fails to address the claims or oppose a motion challenging those claims."). More specifically, Plaintiff's response only provides argument for the excessive force claim against the individual Defendants and fails to provide any analysis addressing his *Monell* claim against the City. *See Thomas v. Bolivar Cnty.*, 4:26-cv-3-RPC-JMV, 2026 U.S. Dist. LEXIS 102369, at *10 (N.D. Miss. May 8, 2026) ("To state a plausible claim against the [City] under § 1983, Plaintiff must allege and establish that (1) an official policy '(2) promulgated by the municipal policy maker (3) was the moving force behind the violation of a constitution right.'") (quoting *Webb v. Town of Saint Joseph*, 925 F.3d 209, 214 (5th Cir. 2019)).

Accordingly, as Plaintiff has failed to meet his burden in responding to much of the summary judgment arguments made in Defendants' motion, the only claim before the Court is the excessive force claim against the individual Defendants. All other claims against the individual Defendants are abandoned and hereby dismissed with prejudice. Additionally, as no argument was provided in response to the City's assertion that it cannot be held liable, all claims against the City are dismissed with prejudice.

## II. Claims Against the Batesville Police Department

Plaintiff also brings claims against the BPD. The capacity of an entity to sue or be sued is "determined by the law of the state in which the district court is held." Fed. R. Civ. P. 17(b); **Darby v. Pasadena Police Dep't.**, 939 F.2d 311, 313 (5th Cir. 1991). In Mississippi, "a municipalities police department is not a legal entity separate and apart from the municipality." **Long v. Pontotoc Police Dep't.**, 3:23-cv-00443-DMB-DAS, 2024 U.S. Dist. LEXIS 65563, at *3 (N.D. Miss. Mar. 20, 2024) (collecting cases). Thus, the Batesville Police Department is not a proper party to this action and all claims against it are dismissed with prejudice.

## III. *Heck v. Humphrey*

As explained herein, the only remaining claim is the excessive force claim against the individual Defendants. The Defendants' [56] Motion argues that the claim is barred by **Heck v. Humphrey**, 512 U.S. 477. The Court addresses this argument first, as a bar by **Heck** would preclude the claim from proceeding any further.

Under **Heck**, a plaintiff generally cannot bring a § 1983 claim that arises from the same factual circumstances as his arrest to recover for alleged constitutional violations if success on the civil claim would necessarily imply the invalidity of the criminal conviction. Taylor was arrested and charged with simple assault, disorderly conduct, and resisting arrest. [Doc. 56 at 6]. Taylor

8

plead *nolo contendere* to the disorderly conduct and resisting arrest charge, which is a "conviction" that implicates **Heck**. *See* **Olivier v. City of Brandon**, No. 22-60566, 2023 U.S. App. LEXIS 22506, at *8 (5th Cir. Aug. 25, 2023), *rev'd on other grounds*, 607 U.S. 552, 146 S. Ct. 916, 224 L. Ed. 2d 387 (2025); *see also* Miss. Code Ann. § 21-38-7(8) ("Upon the entry of a plea of nolo contendere[,] the court shall convict the defendant"); **Claunch v. Williams**, 508 F. App'x 358, 259 n.2 (5th Cir. 2013). Pertinent to this opinion, the crime of resisting arrest provides that it shall be unlawful for a person to "obstruct or resist by force, or violence, or threats, or in any other manner, his lawful arrest[.]" Miss. Code Ann. § 97-9-73. Disorderly conduct is failing or refusing to promptly comply with or obey a request, command, or order of a law enforcement officer. **Brooks v. City of West Point**, 18 F. Supp. 3d 790, 798 (N.D. Miss. 2014) (citing Miss. Code Ann. § 97-35-7).

Under **Heck**, Plaintiff cannot sustain this § 1983 action if a favorable outcome would "necessarily imply the invalidity of his conviction[s]." *Id.* at 487. Put differently, a plaintiff who has previously been convicted of a crime "cannot recover damages for an alleged violation of his constitutional rights if that violation arose from the same facts attendant to the charge for which he was convicted[.]" **Bush v. Strain**, 513 F.3d 492, 497 (5th Cir. 2008) (citation omitted). As the initial method of overcoming a **Heck** bar, a plaintiff is able to proceed with a § 1983 claim if the underlying conviction has been reversed, expunged, declared invalid, or called into question by the issuance of a writ of habeas corpus—none of which apply here. *Id.*

Thus, the Court focuses "on whether success on the excessive force claim require[s] negation of an element of the criminal offense or proof of a fact that is inherently inconsistent with one underlying the criminal conviction." *Id.* The Fifth Circuit has held that a § 1983 claim does not necessarily imply the invalidity of a resisting arrest conviction, and is therefore not barred by

9

*Heck*, if the factual basis for the conviction is temporally and conceptually distinct from the excessive force claim. *Id.* at 498. Thus, "a claim that excessive force occurred *after* the arrestee has ceased his or her resistance would not necessarily imply the invalidity of a conviction for the earlier resistance." *Id.*; *see also* **Arnold v. Town of Slaughter**, 100 F. App'x 321, 324-25 (5th Cir. 2004) (holding that plaintiff's claims were barred by **Heck** because the plaintiff did not allege "that the police used excessive force *after* he stopped resisting arrest or even that the officers used excessive and unreasonable force to stop his resistance. Instead, [the plaintiff] claim[ed] that he did nothing wrong, but was viciously attacked [by police] for no reason."). Put differently, there is no **Heck** bar if the alleged excessive force occurs after the cessation of the plaintiff's misconduct that gives rise to his prior conviction of resisting arrest. **Aucoin v. Cupil**, 958 F.3d 379, 382 (5th Cir. 2020).

"While the chronology of events is critical, whether a claim is temporally and conceptually distinct is not discerned with mathematical precision. **Sampy v. Rabb**, 144 F.4th 796, 799 (5th Cir. 2025). Instead, to be distinct, Taylor must produce "some evidence to create a fact issue that he was subjected to excessive force after" the cessation of his unlawful conduct. **Lee v. Ard**, 785 F. App'x 247, 248 (5th Cir. 2019).

Similarly, a plaintiff's characterization of how events unfolded is important. If the Complaint "describes a single violent encounter in which the Plaintiff" maintains he was merely "an innocent participant, but the allegations are inconsistent with his conviction, **Heck** applies to bar his excessive-force claims." **Ducksworth v. Rook**, 647 F. App'x 383, 386 (5th Cir. 2016) (internal quotation marks and citation omitted). The relevant inquiry is not necessarily whether the plaintiff "disclaims any intention of challenging his conviction;" rather, if he "makes allegations that are inconsistent with the conviction's being valid, **Heck** kicks in and bars his civil suit."

*Aucoin*, 958 F.3d at 383 (quoting *Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003)). This is because if a plaintiff's allegations supporting his claim are necessarily inconsistent with the validity of the conviction, he is essentially challenging the conviction itself.

Accordingly, the Court first looks to the allegations as pled in the Complaint to see if Plaintiff paints himself as an "innocent participant." Plaintiff's reply brief argues that he "does not contest the validity of the arrest or his subsequent conviction" and "does not challenge the responding officers' authority to arrest or use force to gain initial control." [Doc. 62 at 3]. The reply presents that "the sole issue before the Court is whether defendants used excessive force after plaintiff was restrained and under control." *Id.*

To the contrary, the Complaint alleges that on October 12, 2024, Taylor was inside the gas station making a purchase when Defendant Parrish told him to move a vehicle that did not belong to him. [Doc. 1, ¶ 23-24]. During this conversation, Taylor alleges that Defendant Jones "approached [him] from behind and twisted his arm behind his back in an attempt to handcuff him." *Id.* at ¶ 25. Then, Defendant Parish "tased Mr. Taylor directly in the chest *as Mr. Taylor stood there*." *Id.* at ¶ 26 (emphasis added). Next, Defendants Benson, Jones, and Brown "proceeded to pick Mr. Taylor up off his feet and body slam him onto the ground." *Id.* at ¶ 27. "During this *brutal attack*," the officers then began to "mercilessly tase" the Plaintiff and scream at him to roll over on his stomach while they were attempting to handcuff him, all while Defendant Jones was forcing Plaintiff's "head to stay on the ground." *Id.* at ¶ 28-31 (emphasis added).

The Court recognizes that Plaintiff's characterization of the chronology of events as set forth in the Complaint above could be read as implying that he was an "innocent participant" that was merely subjected to the officer's alleged misconduct. The Fifth Circuit in *Bush v. Strain*, *supra*, reached a similar conclusion, noting that the plaintiff's complaint stated that "at no time did

the plaintiff resist her arrest" and contained similar language that could imply innocence. *Id*. at 499. As it relates to Plaintiff's allegations that he was "brutally attacked" by the officers and merely "stood there" while he was tased, the Court could reach the same conclusion here. Put differently, if the Court were "to take [these] statement[s] at face value, we might agree with the defendants" that Plaintiff attempts to disclaim any wrongdoing leading to his arrest. *Id*. at 16. "However, taking the statement in context" is important. *Id*. When the Court does so, it is clear that Plaintiff "has adequately pleaded a claim for excessive force occurring *after* [he] was restrained." *Id* (emphasis added); *see also* [Doc. 62 at 3] (Plaintiff "does not contest the validity of the arrest or his subsequent conviction" and "does not challenge the responding officers' authority to arrest or use force to gain *initial* control.").[5]

Moving away from the allegations in the Complaint, the Supreme Court has instructed that at summary judgment, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. Where a nonmovant's version of events is "so utterly discredited" by a videotape "so that no reasonable jury could have believed him," a court should view the facts "in the light depicted by the videotape." *Id*. at 380-81. The Fifth Circuit has cautioned that this standard "is a demanding one: a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account." *Darden*, 880 F.3d at 730.

Based upon the video evidence from Officer Jones and Officer Brown, the Court cannot conclude that the videos provide "so much clarity" or so utterly discredit Taylor's version of events

---

[5] Plaintiff's Complaint also provides context by stating under the excessive force claim that Defendants "[r]epeatedly deploy[ed] tasers against him *while he was already restrained*" and "deploy[ed] tasers *after he was handcuffed and fully subdued*[.]" [Doc. 1 at 6].

that he ceased resisting once on the ground or in handcuffs. The video does not clearly and unequivocally depict Taylor continuing to resist. Likewise, it does not clearly establish the contrary, that Taylor had ceased actively resisting. Thus, a reasonable juror could conclude either.

Moreover, Plaintiff claims, and the video shows, that Plaintiff was subject to some force after he was handcuffed. Plaintiff's arguments center around his proposition that he was no longer resisting once on the ground. To this point, the law is clear: "[A] claim that excessive force occurred after the arrestee has ceased his or her resistance would not necessarily imply the invalidity of a conviction for the earlier resistance." **Sampy**, 144 F.4th at 799. This is precisely what Taylor alleges occurred here, and the video evidence does not blatantly or clearly contradict this assertion. Accordingly, the Court finds that Plaintiff's excessive force claim, as limited herein, is not barred by **Heck**.

## IV.     Qualified Immunity – Excessive Force

### A.     Defendant Busby and Defendant Parrish

Having found that Plaintiff's excessive force claim pertaining to the force used once he ceased resisting is not **Heck**-barred, the Court now turns to the merits of the claim. Once an individual defendant asserts qualified immunity, the usual summary judgment burden of proof is altered. *See Valdera v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019). The plaintiff bears the burden of "rebut[ting] the defense by establishing a genuine fact issue as to whether the official allegedly wrongful conduct violated clearly established law." **Baker v. Coburn**, 68 F.4th 240, 244 (5th Cir. 2023).

First, each individual Defendants' actions must be examined independently to determine his entitlement to the qualified immunity defense. **Solis v. Serrett**, 31 F.4th 975, 981 (5th Cir. 2022); *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007) (collecting cases); **Joseph v.**

*Bartlett*, 981 F.3d 319, 325 (5th Cir. 2020). Each of the individual Defendants in this action moved for summary judgment premised on qualified immunity, asserting that their actions did not violate the Plaintiff's clearly established constitutional rights. [Doc. 56]; [Doc. 71]. Thus, it then became Plaintiff's burden to overcome this defense as to each individual Defendant. *Baker*, 68 F.4th at 244.

The only allegations in the Complaint against Defendant Parish concern the alleged pattern of harassment of Plaintiff beginning in 2012 and the first taser deployment while Plaintiff was still standing. [Doc. 1, at 2-4]. As explained herein, Plaintiff has abandoned all claims except for the excessive claim relating to the use of force once he was on the ground. Defendant Parrish argues that, based on the video evidence, he was apprehending another individual throughout the entire interaction between Plaintiff and the officers and could not be liable for excessive force if he exuded no force. *See* [Doc. 56, Ex. B]. Neither Plaintiff's original or supplemental response overcame Parish's assertion and, therefore, failed to create a genuine issue of material fact concerning forced used by Parrish. *See* [Doc. 62]; [Doc. 72]. Accordingly, Defendant Parrish is entitled to qualified immunity and the excessive force claim against him is dismissed with prejudice.

The Complaint only references Defendant Busby's actions once by alleging that he "held Mr. Taylor's legs" while he was on the ground and before he was placed in handcuffs. [Doc. 1 at 4, ¶ 30]. Defendant Busby asserts that he was not present at the scene during the interaction and that his presence in this lawsuit was a mistake. *See* [Doc. 57 at 3, n. 3]; [Doc. 71 at 7]. Plaintiff's original response and supplemental response do not dispute this assertion. Accordingly, Defendant Busby is also entitled to qualified immunity, and the excessive force claim against him is dismissed with prejudice.

14

B.       Defendants Brown, Benson, and Jones

The Court now turns to the actions of Defendants Brown, Benson, and Jones. The doctrine of qualified immunity "protects public officials from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jennings v. Patton*, 644 F.3d 297, 300 (5th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)). Once the defense of qualified immunity is raised, "the burden shifts to the plaintiff to show that the defense is not available." *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015).

"In resolving questions of qualified immunity at summary judgment, courts engage in a two-prong inquiry." *Tolan v. Cotton*, 572 U.S. 650, 655, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014). First, the court determines "whether the facts, '[t]aken in light most favorable to the party asserting the injury,…show[s] the officer's conduct violated a [federal] right[.]'" *Id*. at 655-56 (alterations in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)). Second, the court determines "whether the right in question was 'clearly established' at the time of the violation." *Id*. "Courts may address the two prongs in any order, and defendants are entitled to qualified immunity if the plaintiff fails either prong." *Wetherebe v. Tex. Tech Univ. Sys.*, 138 F.4th 296, 301 (5th Cir. 2025) (footnotes omitted). A governmental official "violates clearly established law when, at the time of the challenged conduct, the contours of the right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 536 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011). Although a case does not have to be "directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104, 138 S. Ct. 1148, 200 L. Ed. 2d 449 (2018).

15

Defendant Jones and Defendant Brown's body camera footage provides the Court with the clearest version of events from the morning of October 12, 2024; Accordingly, the Court analyzes the footage, along with other evidence, to determine whether the officers used excessive force in violation of Plaintiff's Fourth Amendment rights. *See* [Doc. 56, Ex. A & B]. In doing so, the Fifth Circuit has explained, consistent with Supreme Court precedent, that "a plaintiff's versions of facts should not be accepted for purposes of qualified immunity when it is 'blatantly contradicted' and 'utterly discredited' by the video records." ***Curran v. Aleshire***, 800 F.3d 656, 664 (5th Cir. 2012) (quoting ***Scott***, 550 U.S. at 380-81). This standard imposed by the Supreme Court "is a demanding one: a court should not discount the nonmoving party's story unless the video evidence provides *so much clarity that a reasonable jury could not believe his account.*" ***Darden***, 880 F.3d at 730 (emphasis added).

Defendant Jones was present throughout the interaction with Plaintiff, including the original verbal confrontation, Plaintiff's initial resistance, the takedown, and the subsequent restraint and ultimate handcuffing of Plaintiff. Defendant Brown rushed to the scene from the neighboring gas station parking lot once the physical interaction began and ultimately assisted Defendants Benson and Jones in taking Plaintiff to the ground. Once on the ground, Plaintiff is seen laying on his back while officers instruct him to roll over onto his stomach so he can be handcuffed. While on the ground and in the midst of the struggle, Plaintiff is tazed several times by Defendant Brown and Defendant Benson, and Defendant Jones delivered strikes to Plaintiffs head, neck, and face area. Once Plaintiff is successfully placed in handcuffs and lying chest down, all of the officers immediately stand up.

First, Plaintiff's [62] response brief and [72] supplemental response brief focus solely on the Defendants' use of force once Plaintiff was on the ground and "restrained, immobilized, and

16

no longer capable of resisting[.]" [Doc. 62 at 7]; *see also* [Doc. 72 at 6] (characterizing the issue before the Court as "whether a reasonable jury could conclude that Plaintiff had been effectively subdued, immobilized, or otherwise brought under physical control when *additional* force was applied."). Thus, the Court only analyzes the alleged excessive force once Plaintiff was on the ground, as the video also confirms beyond all doubt Plaintiff's resistance up to that point.

The Court first determines whether the amount of force used by each Defendant violated the Plaintiff's Fourth Amendment rights.[6] *See **Davis v. Nelson***, 4:25-cv-195-RPC-DAS, 2026 U.S. Dist. LEXIS 122537, at *7 (N.D. Miss. June 3, 2026) (A defendant "cannot be liable for causing…a constitutional violation if no violation occurred.") (citation omitted). To prevail on an excessive force claim at the summary judgment stage, Plaintiff must demonstrate that he suffered: (1) an injury, (2) which resulted directly from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable. *See **Betts v. Brennan***, 22 F.4th 577, 582 (5th Cir. 2022); ***Flores v. City of Palacios***, 381 F.3d 391, 396 (5th Cir. 2004); ***Graham v. Connor***, 490 U.S. 386, 388, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)); ***Ramirez v. Killian***, 113 F.4th 415, 424 (5th Cir. 2024).

The second and third elements of excessive force claims generally collapse into a single objective reasonableness inquiry. ***Ramirez***, 114 F.4th at 424 (citation omitted). Additionally, because the officers assert the defense of qualified immunity, it is Taylor's burden to prove "that genuine issues of material fact exist regarding the reasonableness of the [officers'] conduct." ***King v. Handorf***, 821 F.3d 650, 654 (5th Cir. 2016).

The Supreme Court has instructed courts to consider the "reasonableness" of an officer's use of force by giving "careful attention to the facts and circumstances of each particular case"

---

[6] Excessive force claims arising from an arrest invoke Fourth Amendment protections against unreasonable seizures. ***Tucker v. City of Shreveport***, 998 F.3d 165, 171 (5th Cir. 2021).

and weighing of the following non-exclusive factors (known as the ***Graham*** factors): (1) the severity of the crime at issue (2) whether the suspect posed an immediate threat to the safety of the officers or others, (3) and whether he was actively resisting arrest or attempting to evade arrest by flight. ***Graham***, 490 U.S. at 396. Importantly, "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." ***Id***. Thus, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." ***Id***. Instead, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. ***Id.*** at 396-97.

Plaintiff points to two distinct moments of the interaction and uses of force. The first concerns the force applied by the officers once he was taken to the ground and allegedly no longer resisting, including the drive-stun applications and strikes to his head and neck area. The second concerns Defendant Brown's use of the drive-stun to retrieve Plaintiff's wallet. The Court examines each in turn.

i.       <u>Force Once on the Ground</u>

Regarding the first ***Graham*** factor, Taylor was charged with and arrested for disorderly conduct and resisting arrest, neither of which are severe crimes. *See **Dilworth v. Tucker***, No. 1:24-cv-58-GHD-DAS, 2025 U.S. Dist. LEXIS 133792, at *9 (N.D. Miss. July 14, 2025) ("Plaintiff was arrested for…disorderly conduct[] and resisting arrest, [neither] of which are severe in nature."). Thus, the first factor weighs in Plaintiff's favor.

Next, courts have long recognized that "the right to make an arrest…necessarily carries with it the right to use some degree of physical coercion…to effect it." ***Tucker***, 998 F.3d at 171.

18

However, courts must consider not only the need for force, but also the relationship between the need and amount of force used. *Cloud v. Stone*, 993 F.3d 379, 384 (5th Cir. 2021). When dealing with an uncooperative arrestee, officers properly use measured and ascending actions that correspond to the arrestee's escalating verbal and physical resistance. *Id*. (quoting *Joesph*, 981 F.3d at 332).

Police officers are allowed to use force in ways "that correspond[] to [a suspect's] escalating verbal and physical resistance." *Poole*, 691 F.3d at 629. However, "[t]he timing, amount, and form of a suspect's resistance are key to determining whether the force used by an officer was appropriate or excessive." *Joseph*, 981 F.3d at 332. Further to this point, "[f]orce must be reduced once a suspect has been subdued." *Id*. at 335. "[S]ubdued does not mean handcuffed. If the suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple officers—force is not justified." *See Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016). As explained in *Joseph*, "summary judgment is inappropriate when the timing of the officer's force may or may not have corresponded to the timing of the suspect's resistance." *Id*.

The body camera footage provides important context. As the Defendants point out, the footage depicts a chaotic sequence of events that are largely uninterrupted. The Supreme Court recently reiterated that courts cannot "narrow the totality-of-the-circumstances inquiry[] to focus on only a single moment." *Barnes v. Felix*, 605 U.S. 73, 83, 145 S. Ct. 1353, 221 L. Ed 2d 751 (2025). Instead, the Court "must look to, in this and all excessive-force cases, any relevant events coming before" the use of force in question. *Id*. This is because prior events may show why a reasonable officer at the scene would perceive an arrestee's actions as resisting even though they may not actually be doing so. *Id*. at 73-74. Put differently, "deciding whether a use of force was objectively reasonable demands careful attention to the facts and circumstances relating to the

19

incident, as then known to the officer." *Id*. at 80. "Prior events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening." *Id*. Courts must look to "[t]he history of the interaction," which may "thus inform the reasonableness of the use of force." *Id.* at 80-81.

Here, the interaction begins with a verbal dispute between the officers and Plaintiff. Plaintiff is eventually instructed to leave the premises. Plaintiff refused and was repeatedly told that failing to leave could result in his arrest. When officers attempted to handcuff him, Plaintiff instantly began to physically resist. Officers allege that at one point in the interaction Plaintiff grabbed Officer Jones by the throat to the point that he began to blackout.[7] With multiple officers surrounding him, Plaintiff continued to resist and was eventually tased. When the taser failed to gain compliance, Plaintiff continued to resist while being partially cuffed, and officers then resorted to the takedown maneuver. Once on the ground, Plaintiff contends that he was no longer actively resisting arrest and was attempting to comply with the officers' commands. The officers, to the contrary, claim he was actively resisting and was not subdued until he was placed in handcuffs.

Viewing the video footage in the light most favorable to the Plaintiff, the Court does not entirely discount his assertion that it would have been difficult for him to comply the officers to commands to roll over on his stomach, as Defendant Jones was using both hands to force Plaintiff's head and cheek into the pavement for a portion of the struggle. This is evident from the fact that

---

[7] The Court notes that Plaintiff does not deny that he grabbed Officer Jones by the throat. Instead, Plaintiff claims that the Defendants summary judgment evidence in support of this contention—post-incident reports and officer's narratives [Doc. 71, Ex. J; Ex. K]—are insufficient and that the Court should instead rely on the body camera footage. This argument is misplaced for two reasons. First, once the Defendants offered summary judgment evidence in support of their qualified immunity defense, the burden then shifted to the Plaintiff to produce countervailing evidence to the contrary. In the absence of adequate summary judgment evidence offered, the Court accepts the officers' narratives as true. Second, even viewing the body camera footage, Officer Jones can be heard saying "[Plaintiff] had me by the throat" and "when he had me around the throat, I started seeing stars." [Doc. 56, Ex. A].

the second Officer Jones releases the pressure from Plaintiff's face area, he instantly turns over onto his stomach in compliance with the order to roll over. However, the video also shows Plaintiff actively flailing his arms, raising his head up, and at one point using his arm to push against Defendant Jones's legs.

Put differently, the video does not show Plaintiff essentially lying motionless and offering no resistance or even passive resistance. Instead, it shows him actively resisting and officers using force to gain compliance. While the Court notes the officers' use of tasers, open handed strikes, and forcing Plaintiff's head to the ground, these actions did not violate Plaintiff's clearly established constitutional rights, as the officers were attempting to gain compliance from an actively resisting suspect with measured and ascending force. *See **Griggs v. Brewer***, 841 F.3d 308, 315 (5th Cir. 2016); ***Priest v. Grazier***, 860 F. App'x 343, 348 (5th Cir. 2021).

Even if Plaintiff's contention is true that he was not actively resisting, the reasonableness of the officer's use of force must be judged from the perspective of a reasonable officer on the scene. ***Graham***, 490 U.S. at 396. And if the officers reasonably *perceived* that Taylor was resisting at this juncture, they did not violate clearly established law by using such measured and ascending force. ***Griggs***, 841 F.3d at 315. The Court concludes that, when viewing the interaction as a whole, ***Barnes***, 605 U.S. at 80, including the earlier resistance and sequence of events, it would have been reasonable for the officers to *perceive* that Taylor was actively resisting once on the ground.

Officers would also have been reasonable to conclude that Taylor posed a threat to the their safety, given that he had just moments earlier grabbed Officer Jones by the throat to the point he allegedly began to lose consciousness.[8] Additionally, even assuming that Plaintiff was "legitimately attempting to surrender" at some point during the scuffle on the ground, it would

---

[8] *See* n.7.

have been "objectively reasonable for [the officers] to question the sincerity of [Plaintiff's]" alleged attempt of surrendering because "up to that point, [Plaintiff] had shown anything but an intention of surrendering." *Salazar*, 37 F.4th at 282 (quoting *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009). As stated in *Salazar*, "the relevant inquiry is whether—despite the *appearance* of an unambiguous surrender—'an officer [would] have reason to doubt the suspect's compliance and still perceive a threat." *Id*. at 283 (quoting *Escobar v. Montee*, 895 F.3d 387, 394-95 (5th Cir. 2018).[9]

Moreover, the short period of time between the initial verbal interaction between Plaintiff and the officers highlights the "rapidly evolving" nature of the entire incident, which the Court must consider in applying the "calculus of reasonableness" and determining the amount of force necessary in a particular situation. *Graham*, 490 U.S. at 397; *see also Curran*, 800 F.3d at 662 (quoting *Poole*, 691 F.3d at 625-26) (acknowledging the Fifth Circuit has "repeatedly recognized" that "officers are afforded considerable latitude in 'tense, uncertain, and rapidly evolving' situations," particularly where a plaintiff is resisting at the time of the force.).

Similarly, in *Tucker v. City of Shreveport*, 998 F.3d 165 (5th Cir. 2021), the Fifth Circuit held that officers were entitled to qualified immunity when they struck a plaintiff who was "pulling his arms from their grasp and failing to put them behind his back," "not giving his hands to the officers for cuffing," and "not lying still in order to allow himself to be handcuffed," which could "reasonably [be] perceived by Defendant Officers to be a form of physical resistance." *Id*. at 183-84. The Court also noted that "the entirety of the struggle lasted less than one minute. And, importantly, for its duration, the situation was replete with rapid movement, confusion, and the

---

[9] The Court also notes that Plaintiff was far from giving the same signs of "unambiguous surrender" as that of the plaintiffs in *Escobar* and *Salazar*. For instance, in *Salazar*, the plaintiff quickly got out of his vehicle, dropped to his knees, raised his hands, and laid on the ground with his arms above his head and legs crossed. *Salazar*, 37 F.4th at 280.

(apparently ignored) repeated directives[.]" *Id.* at 185. Based "[o]n these facts, given [the plaintiff's] refusal to comply with [the officers'] verbal directives to put his hands behind his back and quit moving, it would not have been evident to Defendant Officers, based on clearly established law, that they were not entitled to use heightened force in order to gain control of [Plaintiff's] hands and place him in handcuffs." *Id*. at 184 (citation omitted). "At minimum, officers of reasonable consequence could disagree as to whether to whether [the Plaintiff's] rights were violated." *Id*.

Thus, the Court finds that the individual actions of Defendant Benson, Brown, and Jones did not violate Plaintiff clearly established rights under the Fourth Amendment by using force to gain compliance. Accordingly, all of the individual Defendants are afforded qualified immunity as it relates to the force used once Plaintiff was on the ground and before he was placed in handcuffs. The next use of force concerns the post-cuffing wallet incident between Plaintiff and Officer Brown only.

ii.      <u>Drive-Stun Application to Release the Wallet</u>

Although the Court has concluded the officers' use of force on the ground and before Plaintiff was handcuffed was reasonable under the circumstances, the Court must now determine whether the final drive-stun deployment by Officer Brown to gain compliance with his order to release the wallet was also reasonable. *See Lytle*, 560 F.3d at 413 ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."); *see also Carroll*, 800 F.3d at 174, 176-78 (granting qualified immunity for one officer's initial taser use but not others' subsequent uses of force); *Curran*, 800 F.3d at 660 (addressing each use of force separately).

23

As explained herein, Defendant Brown's body camera footage has been provided to the Court [Doc. 56, Ex. B].  After Plaintiff was successfully handcuffed, the footage shows that Officer Brown briefly walked away and towards the front of the parked patrol cruisers, but circled back to Plaintiff lying on the ground approximately 10 seconds later. Then, approximately 30 seconds after initially walking away, Officer Brown commanded Plaintiff to release his grip on his wallet. When Plaintiff refused, Brown attempted to pry the wallet from Plaintiff's grip but was unable to do so. When these efforts failed, Brown delivered a five second drive stun to Plaintiff's back while commanding him again to release the wallet. Plaintiff then released the wallet.

The relevant question before the Court is not whether Officer Brown could lawfully order Plaintiff to release the wallet. Rather, the issue is whether, under the totality of the circumstances, Officer Brown acted reasonably in the timing and degree of force he employed after Plaintiff— while handcuffed and lying face down—refused to comply with the lawful command to release the wallet from his grip.

Threat of Harm Factor

The Court has already addressed that the first factor—severity of the crime at issue— weighs in Plaintiff's favor.[10] The second "most important" factor for the Court to consider concerns "whether [Plaintiff] 'posed an immediate threat to the safety of the officer or others.'" ***Malbrough v. Stelly***, 814 F. App'x 798, 803 (5th Cir. 2020) (quoting ***Graham***, 490 U.S. at 396). Consistent with this principle, the Fifth Circuit has held that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." ***Lytle***, 560 F.3d at 413. As stated in ***Lytle***, the relevant "justification for the use of force" is the officer's reasonable perception of threat of harm. ***Id***. Put differently, the "relevant inquiry is

---

[10] *See **Dilworth v. Tucker***, No. 1:24-cv-58-GHD-DAS, 2025 U.S. Dist. LEXIS 133792, at *9 (N.D. Miss. July 14, 2025) ("Plaintiff was arrested for…disorderly conduct[] and resisting arrest, [neither] of which are severe in nature.").

whether the officer used a *justifiable level of force in light of the continuing threat of harm that a reasonable officer could perceive.*" **Salazar**, 37 F.4th at 283 (emphasis added).

In **Salzar**, the non-handcuffed arrestee was lying face down in the prone position with his hands above his head and his legs crossed following a five-minute police pursuit. *Id.* at 280. The district court held that there were genuine factual disputes as to whether the plaintiff posed an immediate threat because of the plaintiff's apparent surrender and the officer could tell that he was not wielding a weapon. *Id*. at 282. The Fifth Circuit reversed and found that the officer was justified in applying a 10-second taser even though the plaintiff seemed to be in a non-threatening position of surrender. *Id*. at 282. The Court explained that it was reasonable for the officers to conclude that the plaintiff posed a threat to officer safety because, although he had surrendered, he remained unrestrained, had not yet been searched, was in close proximity to the officers, could have been armed, and had just led police on a high-speed chase. *Id.*

First, the Court does not dispute Officer Brown's lawful duty or legal justification to search Plaintiff's *person* once he was handcuffed and before he was placed in the back of a police cruiser. Additionally, Officer Brown had every right to separate the Plaintiff from his wallet under these circumstances. To this point, Defendant Brown argues that "[a]t no point *before* the physical altercation was the Plaintiff searched. Also unknown was the contents of his wallet." [Doc. 57 at 21, n. 21].[11] Officer Brown clearly knew that the object in his hand was a wallet. [Doc. 56, Ex. B] ("Let the…wallet go."). Further, Brown's briefing does not argue nor imply that he or any other officer suspected that the wallet contained any sort of weapon. The body camera footage also reflects that, once Plaintiff was handcuffed, the officers' actions did not indicate that they perceived him as posing an immediate threat to their safety.

---

[11] Even if the contents of the wallet were unknown, the Court does not opine on whether a search of the wallet itself at this juncture of the interaction would have been lawful under the Fourth Amendment.

25

Officer Brown's main contention regarding the wallet seems to be *not* that he felt threatened or that he was in immediate danger by Plaintiff refusing to release the grip on the wallet when he resorted to the stun-drive application. Instead, Officer Brown seems more concerned that "contents of the wallet" were "unknown" and questions why a "convicted possessor of drugs [would] not want police to take things from his pockets and his person." [Doc. 57 at 21, n 21; 23]. Thus, viewing the facts in the light most favorable to Plaintiff and based on the totality of the circumstances, a reasonable jury could conclude that he did not pose an immediate threat to the safety of officers or others. *See **Ramirez***, 716 F.3d at 378 ("[A] reasonable officer could not have concluded that [Plaintiff] posed an immediate threat to the safety of the officers by…laying on the ground in handcuffs."). Accordingly, the second ***Graham*** factor weighs in Plaintiff's favor.

Resisting Arrest Factor

The third factor concerns whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight when Officer Brown deployed the drive-stun. The Fifth Circuit has long held that force "must be reduced once a suspect has been subdued" and "force is not justified" if the suspect "lacks any means of evading custody." ***Joseph***, 981 F.3d at 335; *see also **Carroll***, 800 F.3d at 177 (citing ***Bush***, 513 F.3d at 501-02) ("once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive."). This includes applications of a taser after suspect is arrested, subdued, and "no longer resisting arrest." ***Anderson v. McCaleb***, 880 F. App'x 768, 773 (5th Cir. 2012); ***Autin v. City of Baytown***, 174 F. App'x 183, 185 (5th Cir. 2005). And while it is true that "an arrestee who is 'restrained and subdued' is not actively resisting," ***Bush***, 513 F.3d at 502, the fact "that a suspect is handcuffed does not end the inquiry." ***Anderson v. Estrada***, 140 F.4th 634, 645 (5th Cir. 2025) (citing ***Carroll***, 800 F.3d at 177).

26

While some force may be necessary to counter a suspect's active resistance, almost no significant force is authorized in response to passive resistance. *See **Trammell v. Fruge***, 868 F.3d 332, 341 (5th Cir. 2017); ***Hanks v. Rogers***, 853 F.3d 738, 746 (5th Cir. 2017). The Fifth Circuit recently explained in ***Anderson*** that this resisting factor, "in sum, concerns the [Plaintiff's] degree of resistance to the officer's *objective*." ***Anderson***, 140 F.4th at 645 (emphasis in original). Albeit mildly, "an arrestee actively resists by ignoring an officer's orders to stop doing something or refrain from doing something." *Id*. Put differently, "use of force against a handcuffed suspect is not excessive if the suspect is resisting by ignoring [a] lawful command[.]" ***Bailey v. Ramos***, 125 F.4th 667, 684 (5th Cir. 2025) (citing ***Pratt v. Harris County***, 822 F.3d 174, 178 (5th Cir. 2016)); *see also **Betts v. Brennan***, 22 F.4th at 583 (A non-handcuffed arrestee who "declines to follow an officer's orders" is also offering a form of "active resistance.").

Here, the command that Plaintiff failed to follow was to release his grip on the wallet. That is, Officer Brown's "objective" was to obtain the wallet, presumably before placing Plaintiff in the backseat of the police car. ***Anderson***, 140 F.4th at 645. It is undisputed that Plaintiff "offered resistance" to this "objective." *Id*. And, as explained above, failing to follow a command or resisting an officer's objective, even while handcuffed, can constitute active resistance. But this determination is not as simple as it may seem. *See **Betts***, 22 F.4th at 583 (quoting ***Deville v. Marcantel***, 567 F.3d 156, 157 (5th Cir. 2009) ("But the line between active and passive resistance is sometimes hazy and must be judged in light of the 'necessarily fact-intensive' nature of the inquiry."). And the Fifth Circuit also pays "particular attention to whether officers faced active resistance when they resorted to a taser." ***Cloud***, 993 F.3d at 384.

Cases that have found active resistance from a *handcuffed* arrestee saw far more resistance than failing to release a grip on a wallet. *See **Anderson***, 140 F.4th 634 (5th Cir. 2025) (handcuffed-

arrestee struggled in the back of the police car, kicked at officers, and refused to follow multiple commands over the course of ten or more minutes); *Priest v. Grazier*, 860 F. App'x 343, 349 (5th Cir. 2021) (handcuffed-arrestee kicking at officers); *Pratt v. Harris Cnty.*, 822 F.3d 174 (5th Cir. 2016) (handcuffed-arrestee resisted officers by breaking free from the their grip, kicking them, and continuing to exhibit physical resistance); *Griggs v. Brewer*, 841 F.3d 308 (5th Cir. 2016) (handcuffed arrestee sitting in the back of police car kicking officer in the chest). These cases found that force used in response to the active resistance was not to be excessive largely because the plaintiff/arrestee still obviously exhibited a perceived threat, as they were able to physically strike, kick, or struggle with officers while handcuffed. The same cannot be said here, as Plaintiff was lying face down, in handcuffs, and was not kicking or otherwise physically resisting officers. An arrestee who is merely passively resisting typically exhibits a far less amount of physical movement or combative nature. For example, the Fifth Circuit has found that an arrestee mouthing off, pulling his hand away from an officer, or tensing up typically does not cross the line into active resistance. *Betts*, 22 F.4th at 584; *see also* *Trammell*, 868 F.3d at 341-42 (citing *Goodson v. City of Corpus Christi*, 202 F.3d 730, 734 (5th Cir. 2000); *Samples v. Vadzemnieks*, 900 F.3d 655, 662 (5th Cir. 2018). Thus, the Court finds that Plaintiff failing to let go of his wallet while lying face down in handcuffs is more closely aligned to prior cases finding passive resistance.

Moreover, cases that reiterate the proposition that force may be used in order to gain an arrestee's compliance with instructions generally concern arrestees who had not yet been "subdued," whether by handcuffing or otherwise. *See e.g.*, *Carroll v. Ellington*, 800 F.3d 154, 175 (5th Cir. 2015) (a non-handcuffed arrestee failing to comply with an order to "get on the ground" and officer's taser use to gain compliance not objectively unreasonable); *Deville v. Marcantel*, 567 F.3d 156, 168 (5th Cir. 2009) ("Officers may consider a suspect's refusal to comply with

28

instructions" to determine whether the use of a high degree of force on a suspect refusing to exit her vehicle is objectively reasonable.); *Buchanan v. Gulfport Police Dept.*, 530 F. App'x 307, 314 (5th Cir. 2013) ("[W]here a suspect resists arrest or fails to follow police orders, officers do not violate his right against excessive force by deploying their tasers *to subdue him*.") (emphasis added); *Poole*, 691 F.3d at 626 (holding the use of tasers was not unreasonable where suspect resisted arrest and officers ceased the use of the taser after arrestee was handcuffed). Put differently, cases discussing whether an officer's measured and ascending responses to continued resistance generally occur "as part of a single, continuous effort" to gain compliance of a suspect who is resisting handcuffing. *See e.g.*, *Ramirez v. Killian*, 133 F4th 415, 426 (5th Cir. 2024).

Additionally, while *Graham* identifies several factors bearing on the reasonableness of force used, the factors are non-exclusive, and the Court may also consider whether "the amount of force used [was] excessive to the need." *Thomas v. White*, 4:22-cv-124-SA-JMV, 2024 U.S. Dist. LEXIS 174458, at *35 (N.D. Miss. Sept. 26, 2024); *see also* *Cloud*, 993 F.3d at 384. As the Fifth Circuit has explained: "[a]lthough officers may need to use 'physical force…to effectuate a suspect's compliance' when he refuses to comply with commands…, the officers still must assess 'the relationship between the need and the amount of forced used.'" *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) (quoting *Deville*, 567 F.3d at 167-68). Consistent with this principle, "[the Fifth Circuit's] cases do not establish that when mere passive resistance is at issue, officers are precluded from using any force, but instead that amount of reasonable force varies." *Anderson*, 140 F.4th at 646 (internal citation and quotation marks omitted).

The Fifth Circuit "has several times found that the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need." *Trammell*, 868 F.3d at 342. For example, in *Trammell*, the Court held that even if the plaintiff's decision to pull his

arm away from officers amounted to "some degree of resistance that would justify an officer's use of force," the officers' actions were not reasonable because only three seconds elapsed between the officer's initial request and the use of force. *Id*. Thus, the Court held that a reasonably jury could find that more negotiation could have been used before resorting to force. Similarly, in *Deville* and *Newman*, *supra*, the Fifth Circuit explained that when officers "immediately resort[] to [the use] of a taser" before using "very little, if any, negotiation" with a suspect, or "without attempting to use physical skill, negotiation, or even commands," such use of force will typically be objectively unreasonable. *Deville*, 567 F.3d at 167-68; *Newman*, 703 F.3d at 763. Additionally, "[w]hile a suspect's refusal to comply with instructions may indicate that physical force is justified, officers must also select the appropriate *degree* of force." *Joseph*, 981 F.3d at 332. The "touchstone" of the Court's inquiry is the reasonableness of the force used. *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022).

Here, Officer Brown argues:

"Plaintiff had 9 or 10 seconds to comply to lawful commands [to release the wallet]. He chose not to. He had the same amount of time in which he was subjected to hands-on force by Brown to pry the wallet away. Plaintiff won that struggle. Thus, the next level of force up to the continuum was non-lethal, a drive stun, which is exactly what happened. Thus, Brown should be protected…under qualified immunity as the drive stun was a reasonable and measured use of force against an actively resisting suspect."

[Doc. 65 at 7-8].

At the 2:18 mark of the body camera footage, Officer Brown issued the first command for Plaintiff to release his grip on the wallet. *See* [Doc. 56, Ex. B]. Around the 2:20 mark, Officer Brown then began to attempt to pry the wallet from Plaintiff's grip. *Id.* Approximately seven seconds later, at the 2:27 mark, Officer Brown issued the second command for Plaintiff to let go of the wallet while simultaneously delivering the drive-stun to Plaintiff's back. *Id*. This drive-stun

30

application lasted about five seconds, until the 2:33 mark of the body camera footage. *Id*. Plaintiff then released his grip of the wallet. This sequence of events shows that from the time Officer Brown issued the first command to let go of the wallet to the time Plaintiff does so is approximately thirteen seconds. Additionally, Officer Brown issued only one command to release the wallet before resorting to using the drive-stun application, given contemporaneously with a second command.

The Court does not dispute Officer Brown's argument that he responded to Plaintiff's refusal to comply with the lawful command to release the wallet with "measured and ascending" responses of force. Indeed, officers "[f]aced with an uncooperative arrestee…properly use measured and ascending actions that correspond to the arrestee's escalating verbal and physical resistance." *Cloud*, 993 F.3d at 384 (internal citations and quotation marks omitted). Specifically, he first commanded Plaintiff to release his grip on the wallet. When Plaintiff refused, Officer Brown attempted to physically pry the wallet from Plaintiff's clenched hand. As the last method to gain compliance, he delivered an approximate five second drive-stun application. "[Fifth Circuit] cases emphasize that 'measured and ascending actions that correspond to [the arrestee's] escalating verbal and physical resistance' are reasonable." *Anderson*, 140 F.4th at 647 (quoting *Cloud*, 993 F.3d at 384); citing *Joseph*, 981 F.3d at 332-33; *Poole*, 691 F.3d at 629; *Betts*, 22 F.4th at 583.

This short sequence of events also shows that Officer Brown did not tase Plaintiff as a first resort to gain compliance with his command to release the wallet. That is, he did not "*immediately* resort[] to [the taser]…without *attempting* to use physical skill, negotiation, or even commands." *Newman*, 703 F.3d at 763 (emphasis added). After issuing a single command to release the wallet and attempting to retrieve the wallet for about five seconds, Officer Brown quickly resorted to the

31

use of the stun drive. A total of seven seconds elapsed between the first command and the use of the taser. Thus, "[a] reasonable jury could infer [from the body camera footage] that [Officer Brown] engaged in very little, if any, negotiation with [Plaintiff]" before resorting to using his taser. *Deville*, 567 F.3d at 168.

As in *Trammell*, while an arrestee pulling his arm away from an officer, or, in this case, Plaintiff refusing to let go of his wallet, was arguably some degree of resistance that may have warranted some corresponding degree of force, mere seconds passed between Officer Brown's first command and the ultimate use of the taser. 863 F.3d at 342 ("[T]he quickness with which the officers resorted to tackling [the plaintiff] to the ground militates against a finding of reasonableness."). Because mere seconds passed, a reasonable jury could find that more negotiation should have been used before resorting to the use of a taser to gain compliance. *Id*. Furthermore, "taking the facts in the light most favorable to [Plaintiff]," a jury could also "reasonably find that the *degree* of force" used by Officer Brown—a five second stun-drive—"was not justifiable under the circumstances." *Deville*, 567 F.3d at 167-68.

As the Fifth Circuit has explained: "[a]lthough officers may need to use 'physical force…to effectuate a suspect's compliance' when he refuses to comply with commands…, the officers still must assess 'the relationship between the need and the amount of forced used.'" *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) (quoting *Deville*, 567 F.3d at 167-68). Here, Officer Brown's purported need for the force was to gain compliance with his command to release the wallet. The amount of forced used to accomplish this need was tasing Plaintiff for approximately five seconds. A reasonable jury could conclude that the relationship between this need and the forced used to effectuate it was unreasonable under the circumstances.

32

Additionally, the context of cases that stand for the proposition that force may be used to gain compliance with an officer's instructions are important. In ***Anderson***, for example, the Court found the officers used reasonable measured and ascending actions when they struggled with the arrestee for a lengthy period of time—over ten minutes—before their objective of getting the plaintiff secured in the back of the police car was achieved. It goes without saying that ten minutes is far more time than seven seconds in attempting to gain compliance before resorting to force. Moreover, the arrestee in ***Anderson*** exhibited far more resistance—kicking and using his legs to prevent officers from shutting the doors to the police car—than Plaintiff did here. Finally, in ***Anderson*** the officers were trying to get the plaintiff secured in the back of the patrol car while here the officer is attempting to remove a wallet from the plaintiff's possession.

***Bailey v. Ramos***, 125 F.4th 667 (5th Cir. 2025) is another case where an officer's use of force on a handcuffed arrestee was found to be reasonable. In ***Bailey***, the arrestee was tackled to the ground and then placed in handcuffs. Once he was handcuffed, the Court characterized the sequence of events as follows:

> The officers lifted Bailey into a standing position and placed him up against a nearby wall. There, Bailey repeatedly yelled expletives at [the officers] while they asked him to calm down and sit down. Bailey screamed at both officers…, *was moving about*[,] *and stepped toward the officers*. The officers guided him back against the wall with their hands while *telling him repeatedly* to sit down. Bailey did not comply…[One of the officers] then used some type of leg maneuver to bring Bailey to a seat on the ground.

***Id***. at 673-674 (emphasis added).

In discussing whether the force used to gain compliance with the lawful order to sit on the ground was reasonable, the Court held that "[b]ecause the video evidence show[ed] that Bailey was not complying with the officers' lawful orders to sit down, [the officer's] responsive use of force was not objectively unreasonable under the Fourth Amendment." ***Id***. at 684. Certain

distinctions can be made here. First, a leg sweep to gain compliance with a directive to sit down is less force than a five second stun-drive. Second, a standing arrestee that is moving about, stepping towards officers, and failing to comply with directives, even while handcuffed, provides a more reasonable perception of a threat of harm than one lying face down merely refusing to let go of a wallet. These actions also exhibit more active resistance to an officer's objective. Lastly, the officers in **Bailey** "repeatedly" told the arrestee to sit down. As explained herein, Officer Brown issued one command to let go of the wallet before momentarily trying to pry the wallet from the Plaintiff's grip and then resorting to the stun-drive.

In conclusion, an excessive force claim requires a plaintiff to show, *inter alia*, that the use of force was objectively unreasonable in light of the facts and circumstances confronting them. *Newman*, 703 F.3d at 762. The "touchstone" of the Court's inquiry is the reasonableness of the force used. *Buehler*, 27 F.4th at 981. Once Plaintiff was handcuffed, Officer Brown was not forced to make a split-second decision in a scene that was rapidly evolving. *See Graham*, 490 U.S. at 396-97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). The chaos of the event had drastically deescalated at the point when Officer Brown resorted to using his taser. Accordingly, the Court concludes that, under the facts presented here, Officer Brown is not entitled to qualified immunity because a reasonable jury could find that applying a five-second drive-stun to Taylor's back while he was handcuffed, lying face down, and at most passively resisting constituted objectively unreasonable force. For these reasons, the third **Graham** factor, whether Plaintiff was actively resisting arrest at the moment the force was applied, weighs in Plaintiff's favor.

Lastly, circling back to the elements of an excessive force claim, Plaintiff must demonstrate that he suffered: (1) an injury, (2) which resulted directly from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable. *See Betts*, 22 F.4th at 582. Neither party's briefs address the injury element in detail, and the issue is not squarely before the Court. However, the Court finds it necessary to briefly address it.

To state a claim of excessive force, Plaintiff must prove that an injury occurred as a direct result from the use of clearly unreasonable excessive force. While mere "*de minimis*" injuries are not cognizable under 42 U.S.C. § 1983, "[a]ny force found to be objectively unreasonable necessarily exceeds the *de minimis* threshold." *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017); *see also Solis v. Serrett*, 31 F.4th 975, 981 (5th Cir. 2022) ("[T]he extent of injury necessary to satisfy the injury requirement is directly related to the amount of force that is constitutionally permissible under the circumstances."). As explained herein, Officer Brown's use of force could found by a reasonable juror to be objectively unreasonable. Therefore, "as long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Bagley*, 90 F.4th at 804 (quoting *Solis*, 31 F.4th at 982). And "the video evidence permits a jury to conclude that the tasing caused [Plaintiff] significant pain." *Id*. Thus, at this juncture in the proceedings, Plaintiff has established the injury requirement.

<u>Clearly Established Law</u>

Even if Plaintiff's constitutional rights were violated, the qualified immunity analysis is a two-prong inquiry: the right in question must have been "clearly established" at the time of the violation. *Tolan*, 572 U.S. at 655-56. For a right to be clearly established, the "constitutional question" must be "beyond debate." *Ashcroft*, 563 U.S. at 741. The right must have also been so

clearly established such that a reasonable officer would know that the particular level of force used was excessive. *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (1989).

There are a few ways to satisfy the clearly established prong. First, a plaintiff may identify controlling authority "where an officer acting under similar circumstances…was held to have violated the [Constitution]." *Joseph*, 981 F.3d at 337 (quoting *D.C. v. Wesby*, 583 U.S. 48, 64, 138 S. Ct. 577, 199 L. Ed. 2d 453 (2018)). Second, in the absence of controlling authority, a plaintiff may identify "a robust 'consensus of cases of persuasive authority'" in which officers acting under similar circumstances were found to have violated the Constitution. *Ashcroft*, 563 U.S. at 742. Third, a plaintiff may demonstrate the "obvious case" where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). In such a case, the plaintiff "need not identify an on-point case to overcome qualified immunity." *Salazar*, 37 F.4th 278, 285 (5th Cir. 2022) (quoting *Hope v. Pelzer*, 563 U.S. 730, 741, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)).

It was established at the time of this incident that, generally speaking, "once a suspect has been handcuffed and subdued, and is no longer resisting arrest, an officer's subsequent use of force is excessive." *Hinson v. Martin*, 853 F. App'x 926, 933 (5th Cir. 2021) (quoting *Carroll*, 800 F.3d at 177); *see also Ramirez*, 716 F.3d at 278-79 (denying qualified immunity where officers tased the plaintiff while handcuffed, subdued, and lying face down, even though he posed no threat to the officers); *Bush*, 513 F.3d at 500-02; *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) (Holding that an "an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight right, who engages in, at most, passive resistance[].").

Moreover, as all of the *Graham* factors weigh in Plaintiff's favor, this presents an "obvious case" and supplies the clearly established prong of qualified immunity. *See Hanks*, 853 F.3d at 734 (quoting *White v. Pauly*, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017) ("In 'an obvious case,' *Graham*…may supply the 'clearly established law.'"); *see also Darden*, 880 F.3d at 733 (same); *Cooper v. Brown*, 844 F.3d 517, 524 (5th Cir. 2016) (same).

Accordingly, viewing the evidence in the light most favorable to Plaintiff, the Court concludes that a reasonable jury could find that Officer Brown violated Plaintiff's clearly established Fourth Amendment right to be free from excessive force when he deployed a five-second drive-stun application to obtain Plaintiff's wallet. Officer Brown is therefore not entitled to qualified immunity, and Plaintiff's excessive force claim against him may proceed. All remaining claims against all other Defendants are dismissed.

## V.     Conclusion

Defendant's Motion for Summary Judgment [56] is **GRANTED IN PART AND DENIED IN PART**. The claims against the city of Batesville, Mississippi, and the Batesville Police Department are hereby **DISMISSED WITH PREJUDICE**. Officer Titus Benson, Sergeant Greg Jones, Lieutenant Josh Busby, and Lieutenant Will Parish are entitled to qualified immunity, and the individual capacity claims against them are **DISMISSED WITH PREJUDICE**.

Officer Matthew Brown is not entitled to qualified immunity with respect to Plaintiff's excessive force claim arising solely from Brown's use of a five second stun application to compel Plaintiff to release his wallet. The excessive force claim survives only as to that discrete use of force; all other excessive force allegations and claims are dismissed. Accordingly, Defendants' [57] Motion is **DENIED** as it pertains to this claim and **GRANTED** in all other respects. A separate order shall issue.

**SO ORDERED**, this the 10th day of August, 2026.

_____
UNITED STATES DISTRICT JUDGE

38